Case 10-206, Document 2, 01/19/2015, 3192, Page1 of 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
DR. DUSHAN KOSOVICH,         :

         Plaintiff,      :     09 Civ. 6992 (JSR)
                         :
         -v-          :     <u>MEMORANDUM ORDER</u>
                         :
METRO HOMES, LLC, DEAN S. GEIBEL,   :
PAUL E. FRIED, DONALD J. TRUMP, THE  :
TRUMP ORGANIZATION, INC., UBS     :
FINANCIAL SERVICES, INC, KENNETH   :
KAVANAGH, METRO HARBORSPIRE, LLC,   :
METRO HARBORSPIRE GM, LLC, and VECTOR :
URBAN RENEWAL ASSOCIATES, LLP,    :
                         :
         Defendants.     :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

     By Order dated November 30, 2009, the Court granted
defendants' motions to dismiss the complaint with prejudice.  This
Memorandum Order provides the reasons for this ruling and directs
entry of final judgment.

     On August 6, 2009, plaintiff, Dr. Dushan Kosovich, brought
this action alleging securities fraud and various state-law claims in
connection with his investment in a real estate project known as
"Harborspire."  This project contemplated the financing and
construction of two condominium towers in Jersey City, New Jersey.
Plaintiff's complaint levies allegations against various groups of
defendants.  The first group (the "Metro Homes Defendants") consists
of various entities that were involved in the project's development
and financing, including Metro Homes, LLC[1] ("Metro Homes," the

_____

    [1] The numerous typographical errors in plaintiff's complaint
-- which, for example, refers to this entity as "Metro Homes,

project's developer); Metro Harborspire, LLC ("Harborspire," the entity that made the securities offering at issue); Metro Harborspire GM, LLC (the General Manager of Harborspire); and Vector Urban Renewal Associates GM, LLC (the entity that owned the land where the project was built) -- along with two of the principals of these entities, Dean S. Geibel and Paul E. Fried.[2]  The second group (the "UBS Defendants") consists of UBS Financial Services, Inc. ("UBS"), and Kenneth Kavanagh, a former UBS broker, who acted as plaintiff's investment advisors and are alleged to have induced him to make the investment in Harborspire.  The third group (the "Trump Defendants") consists of Donald J. Trump and The Trump Organization, Inc., who are alleged to have lent the Trump name to the project in promotional and advertising materials.

The primary claim in plaintiff's complaint alleges securities fraud, in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, relating to his investment in the Harborspire project.  According to the complaint, plaintiff, a Serbian-born psychiatrist who is a naturalized U.S. citizen, is "completely naive and uninformed as to financial

---

LLLC" -- have made it necessary for the Court to consult other pleadings and documents referenced therein in order to determine the correct names of the corporate defendants.

[2] According to the Metro Homes defendants, Fried is no longer an employee of Metro Homes and has not been served with the complaint.  See Metro Homes/Trump Mem. at 1 n.1. Nonetheless, as the reasons for dismissal apply equally to him as to others, the complaint against him is dismissed with prejudice.

2

matters." Compl. ¶ 21. Plaintiff held an investment account with UBS, and was informed of Harborspire by Kavanagh, who encouraged him to invest in the project. Id. ¶ 15. According to plaintiff, UBS and Kavanagh represented that his investment would be in the nature of a loan that would earn fixed interest in the amount of 15% per annum over three years, and that his principal would be returned at that time. Id. ¶¶ 16, 27. He was not informed that the investment would be divided into two "classes" of interests. Id. ¶ 16. Relying on these alleged representations made by the UBS Defendants, as well as certain offering materials provided by the Metro Homes Defendants and the Trump Defendants' association with this project, plaintiff committed to invest $1,000,855.67 in the project. Id. ¶¶ 21, 24. Plaintiff in fact invested that amount in 2005, after taking out a mortgage on his apartment to obtain the necessary funds. Id. ¶¶ 24, 26.

The returns on his investment, however, fell far short of what was promised. In January 2006, July 2006, and January 2007, plaintiff received partial interest payments of approximately $22,000 (far less than the allegedly promised annual return of approximately $150,000 a year) in what he characterizes as a "calculated gesture" by defendants. Id. ¶¶ 28-30. He received no other interest payments, and his principal has not been returned. Id. ¶ 30. On information and belief, the project has generated no profits, nor was the project generating any revenue at the time plaintiff was

solicited to invest or at the time the partial interest payments were made.  Id. ¶¶ 52, 54.[3]

Plaintiff alleges that all defendants engaged in securities fraud in connection with the solicitation of his ill-fated investment.  With respect to the UBS Defendants, the complaint alleges that they knowingly misrepresented his investment as a fixed-interest loan, and the complaint can be read to suggest that they were motivated to do so based on "commissions" and "payments" tendered by the Metro Homes Defendants.  Id. ¶¶ 31, 50, 57.  With respect to the Metro Homes Defendants, the complaint alleges similar misrepresentations and nondisclosures as to the risks associated with the investment.  Specifically, plaintiff complains that a brochure prepared by the Metro Homes defendants to solicit investments (the "Brochure," which is attached to the complaint) contained misleading projections of profits.  Id. ¶ 18.  He also identifies misrepresentations or omissions contained in a private placement memorandum ("PPM") associated with the investment, including a lack of projections of anticipated earnings by Harborspire, insufficient disclosure of Trump's participation in the project, and a failure to disclose the total amount solicited in the offering, the distributions of proceeds from the offering, and the alleged payments by the Metro Homes Defendants to the Trump and UBS defendants.  Id. ¶

---

[3] In fact, according to plaintiff's memorandum in opposition to the motions to dismiss, only one of the two towers was constructed.  Pl. Mem. Opp. at 10.

33. The complaint also contains allegations that the Harborspire securities were unlawfully unregistered and that plaintiff did not qualify as a "sophisticated investor" who could participate in such an offering. Id. ¶¶ 34-35.[4] Finally, with respect to the Trump Defendants, plaintiff alleges that Trump licensed his brand to the Harborspire project, id. ¶ 47, and permitted the "promiscuous and indiscriminate use of his name and reputation to create the impression by the general public that Trump was intimately connected and involved with the Project as a principal," which impressed plaintiff and influenced him to invest in the project. Id. ¶¶ 47-49.

Based on the foregoing allegations, plaintiff alleges both federal securities fraud and state-law "misrepresentation and fraud" in, respectively, Counts I and III of the complaint. In addition, in Count II, the complaint alleges that defendants breached an agreement between Kosovich and "Metro [Homes], by way of UBS Financial, . . . whereby Kosovich agreed to advance the sum of $1,000,868 to Metro Homes, Geibel and Fried" in exchange for these defendants' payment of annual interest of 15%, id. ¶ 36; in Count IV, the complaint alleges "monies loaned" based on what plaintiff characterizes as a "loan" to defendant, id. ¶¶ 61-63; and in Count V, the complaint alleges a claim for "monies had and received and unjust enrichment" arising from defendants' retention of the initial investment and unpaid interest, id. ¶¶ 65-68.

---

[4] The complaint contains two paragraphs numbered "34," both of which relate to these allegations.

The above recitation construes plaintiff's complaint generously and accepts its well-pleaded factual allegations as true. To survive a motion to dismiss, these factual allegations, taken together, must "plausibly give rise to an entitlement to relief." Iqbal v. Ashcroft, 129 S. Ct. 1937, 1950 (2009). In assessing whether this standard has been met, however, the Court is not required to assume the truth of the numerous conclusory legal assertions presented in the complaint. Id. Nor must the Court ignore documents incorporated into the complaint by reference, or documents not referenced in the complaint but that plaintiff "either possessed or knew about and upon which [it] relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

To state a claim for securities fraud in violation of Section 10(b) and Rule 10b-5, "plaintiffs must allege that [the defendants] '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005). Before, however, turning to the analysis of the elements of plaintiff's securities fraud claim, the Court notes that plaintiff's complaint is patently deficient in failing to plead facts with any specificity or particularity. The general rule that fraud claims must be pleaded with particularity "is applied assiduously to securities fraud," id. at 168; accordingly, allegations of fraud "ought to specify the time, place, speaker, and

content of the alleged misrepresentations," <u>DiVittorio v. Equidyne Extractive Indus., Inc.</u>, 822 F.2d 1242, 1247 (2d Cir. 1987); <u>accord</u> 15 U.S.C. § 78u-4(b)(1) (codifying heightened pleading requirements for securities fraud actions). Here, however, the complaint's allegations are largely against "defendants" generally, and the complaint repeatedly fails to identify who was responsible for making each alleged misrepresentation or omission, far less specifies the precise content of the alleged misstatements or explains why they are fraudulent. Many of the allegations in the complaint are, indeed, utterly inscrutable, particularly those relating to the Trump Defendants. For example, the complaint alleges that an agreement existed between Metro Homes and "Trump Development," Compl. ¶ 47, an entity that is not a named defendant, but fails to make any allegations against The Trump Organization, which is listed in the case's caption. And although the complaint alleges Trump's involvement in the project, it does not identify any statements made by Trump or Trump-related entities upon which plaintiff relied -- beyond the mere fact that Trump licensed his name to the project.

However, even if some of the defects in this respect could be cured by granting leave to replead, no such leave is appropriate here, because the securities fraud allegations are so substantively flawed they must be dismissed with prejudice. To begin with, plaintiff's core securities fraud claims -- those alleging that defendants represented to plaintiff that his investment would be in the nature of a loan -- fail for the fundamental reason that any

7

Case 10-206, Document 2, 07/19/2015, 3162, Page8 of 16

reliance on the misstatements he alleges was unreasonable as a matter of law, given the innumerable disclaimers in the offering materials.

An absence of justifiable reliance defeats a securities fraud claim, and because this element involves inquiry into what a <u>reasonable</u> investor should have done, plaintiff's professed financial cluelessness is beside the point if he acted unreasonably. It is unreasonable as a matter of law "for a plaintiff to claim to have relied on oral misrepresentations that are contradicted in written offering materials." <u>Spain v. Deutsche Bank</u>, 2009 WL 3073349, at *3 (S.D.N.Y. Sept. 18, 2009) (citing cases); <u>accord, e.g.</u>, <u>Dodds v. Cigna Sec., Inc.</u>, 12 F.3d 346, 351 (2d Cir. 1993) ("Nor can a plaintiff rely on misleading oral statements to establish [a claim that a recommended investment was unsuitable] when the offering materials contradict the oral assurances."); <u>Good Hill Partners L.P. v. WM Asset Holdings Corp. CI 2007-WM2</u>, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) ("[A] reasonable investor would have familiarized [himself] with the potential for loss disclosed in the prospectuses, rather than relying on the oral assurances of brokers." (alteration in original; internal quotation marks omitted)); <u>Feinman v. Schulman Berlin & Davis</u>, 677 F. Supp. 168, 170 (S.D.N.Y. 1988) ("Reliance on statements which are directly contradicted by the clear language of the offering memorandum through which plaintiffs purchased their securities cannot be a basis for a federal securities fraud claim.").

Here, to the extent that plaintiff claims he was orally assured that his investment was in the nature of a "loan," any

reliance on such statements was unreasonable because the written offering materials unambiguously demonstrate the true nature of his investment, are replete with disclaimers as to the risks associated with the investment, and present detailed descriptions of the securities that are plainly inconsistent with an understanding of the investment as a loan with fixed interest payments.  Among much else, the Brochure clearly explains that these are speculative investments in a proposed real estate project.  Indeed, the Brochure contains two boldface disclaimers in all capitals, one stating that "**AS WITH ANY REAL ESTATE INVESTMENT, THERE CAN BE NO ASSURANCE OR GUARANTEE THAT THE COMPANY WILL MEET ITS BUSINESS OR INVESTMENT OBJECTIVES**," Brochure at 18, and the other stating that the "**INVESTMENT AND DEVELOPMENT PROGRAM IS SPECULATIVE AND ENTAILS SUBSTANTIAL RISKS. SINCE MARKET RISKS ARE INHERENT IN ALL REAL ESTATE INVESTMENTS TO VARYING DEGREES, THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVES . . . WILL BE ACHIEVED**," id. at 19.

The Brochure further explains that investments in the project will be divided (equally in plaintiff's case) between two sorts of interests, "Class A" and "Class B," each with its own PPM.  Id. at 2.  Although the Brochure references the PPMs for a more detailed description of the rights and obligations pertaining to each Class, it makes clear that neither Class is a loan.  Rather, the two Classes are described as roughly akin to common and preferred stock: holders of Class A interests receive "a 40% share of the total net proceeds

. . . upon completion of the project and sale of the condominium units," while Class B investors are entitled to "a 15% annual preferred return on their investment payable on a semi-annual basis." Id.[5]  The PPMs for each class also contain disclaimers like those in the Brochure, including one on their cover pages warning that "**THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK.**"  See Class A & Class B PPMs (Geibel Cert. Ex. A, Tabs 2 & 3).  The PPMs go on to state that distributions to both classes of interests are in the "sole discretion" of Metro GM and contingent on there being sufficient cash flow to make the distributions.  See Class A PPM at 12, 35; Class B PPM at 12.

The written representations in the Brochure alone, let alone those in the PPMs, are sufficient to render unreasonable as a matter of law any reliance by plaintiff on the alleged statements by his broker that his investment was in the nature of a three-year loan with annual interest payments of fifteen percent.  This holds true even if the Court were to grant leave for plaintiff to amend his complaint to include the allegation -- raised for the first time in his opposition papers and supporting affidavit[6] -- that he never

---

[5] It should be noted that to the extent plaintiff characterizes the offering documents as somehow guaranteeing him a 15% annual return, such allegations would appear to pertain only to the half of his investment that was allocated to Class B.

[6] "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).

received the PPMs until his lawyer presented them to him in 2009.
Kosovich Opp. Aff. ¶ 10. For one thing, this representation is
contradicted by the fact that, in connection with making the
investment that is the subject of this complaint, plaintiff
undisputedly executed documents indicating that he had received the
PPMs and other offering materials. Geibel Cert. Ex. D at 1, 6.
Moreover, even if it were true that plaintiff did not consult the
PPMs prior to making his investment, his failure to do so was
eminently unreasonable. Most fundamentally, the Brochure, which
plaintiff acknowledges he did receive, expressly mentions the risks
of the investment and includes the boldface disclaimers quoted above.
Thus, plaintiff's professed belief that he was making a $1 million
loan is unreasonable based on the contents of the Brochure alone.

The securities fraud claims also fail for the independent
reason that they are time-barred. The applicable statute of
limitations, 28 U.S.C. § 1658(b)(1), provides that private actions
under the Securities Exchange Act must be brought within two years of
the fraud's discovery. The limitations period commences "when the
plaintiff 'obtains actual knowledge of the facts giving rise to the
action <u>or notice of the facts, which in the exercise of reasonable
diligence, would have led to actual knowledge</u>.'" <u>Shah v. Meeker</u>, 435
F.3d 244, 249 (2d Cir. 2006) (emphasis added) (quoting <u>Kahn v.
Kohlberg, Kravis, Roberts & Co.</u>, 970 F.2d 1030, 1042 (2d Cir. 1992)).
As plaintiff acknowledges in the complaint, the partial interest
payments he received within the first year of making his investment

fell far short of the allegedly promised 15% return.  Because a
reasonable investor in such circumstances would have made inquiries
as to why the promised interest payments for the year were not
received in full, plaintiff must be deemed to have discovered the
fraud as of January 2007 at the latest.  Accordingly, the two-year
statute of limitations applies to bar his claims under the federal
securities laws.

As if all this were not enough, several other necessary
elements of a securities fraud claim are lacking in plaintiff's
complaint.  In securities fraud actions, the plaintiff must "state
with particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind."  15 U.S.C. § 78u-
4(b)(2).  The complaint makes only the faintest gestures toward
pleading the necessary fraudulent intent, and certainly does not
plead facts showing that an inference of scienter is "cogent and at
least as compelling as any opposing inference of nonfraudulent
intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308,
314 (2007).  Although plaintiff makes the conclusory statement that
"defendants knew that the representations . . . were false and
misleading," Compl. ¶ 50,[7] the only facts pleaded along these lines
are bare allegations, based only on information and belief, that UBS
and Trump received unspecified "payments" for their involvement in
the project, see id. ¶¶ 31, 33.  These allegations are deficient

_____

[7] This citation refers to the second of two paragraphs
numbered "50."

12

because they are unaccompanied by "a statement of facts upon which
the belief is founded." <u>Stern v. Leucadia Nat'l Corp.</u>, 844 F.2d 997,
1003 (2d Cir. 1988). But even if they were properly pleaded, they
fall far short of creating a strong inference that defendants acted
with intent to "deceive, manipulate, or defraud." <u>Ernst & Ernst v.
Hochfelder</u>, 425 U.S. 185, 193 (1976).

     The complaint is similarly infirm in its failure to plead
loss causation: it fails to present any allegations that "'the
<u>subject</u> of the fraudulent statement or omission was the cause of the
actual loss suffered,' <u>i.e.</u>, that the misstatement or omission
concealed something from the market that, when disclosed, negatively
affected the value of the security." <u>Lentell</u>, 396 F.3d at 173
(citation omitted). According to the complaint, plaintiff's losses
were a direct result of the project's failure to generate cash flow
or turn a profit, <u>see</u> Compl. ¶¶ 52-53, not defendants'
misrepresentations. While a plaintiff might be able to satisfy this
element by alleging that the risks that materialized were "within the
zone of risk concealed" by the misrepresentations and omissions
alleged, <u>Lentell</u>, 396 F.3d at 173 (emphasis omitted), the complaint
here makes no effort to do so.

     For each and all the above reasons, the securities fraud
claim (Count I), to the extent it rests on allegations that plaintiff
was misled into thinking that his investment in Harborspire was in
the nature of a loan, must be dismissed with prejudice. To the
extent that any ancillary allegations of misrepresentation or

omission can be gleaned from the complaint, they too must be
dismissed.  First, for the reasons discussed above, the complaint
does not allege any actionable statements or omissions by the Trump
Defendants.  Second, the allegations of misrepresentations or
omissions in the PPMs are without merit.  If plaintiff is to be taken
at his word that he never saw the PPMs until 2009, there is no way he
could have relied on these documents when he made his investment in
2005.  In any event, the complaint's allegations of
misrepresentations and omissions in the offering materials, <u>see</u>
Compl. ¶¶ 32-33, are belied by the materials themselves.  The
Brochure explains the division of investments among classes (Brochure
at 2), and the PPMs and other documents referenced therein elaborate
on the terms of investments in each class.  <u>See, e.g.</u>, Class B PPM at
12 (citing Operating Agreement at 3 (Geibel Cert. Ex. A, Tab 4)); <u>id.</u>
at 30-39 (citing the contingencies that could affect distributions to
both classes).  In addition, the Brochure contains a footnote
disclosing the licensing agreement between Trump and Metro Homes and
provides projections of the costs and revenues associated with the
project.  Brochure at 6-8, 16 n.1.  Finally, to the extent the
complaint characterizes the Harborspire offering as illegally
unregistered or plaintiff as an unqualified investor in such an
offering, it is utterly devoid of reference to facts or law that
would support this conclusion.[8]

---

[8] Indeed, in a questionnaire that he filled out in
connection with his Harborspire investment, plaintiff represented
that his net worth was over $1 million, <u>see</u> Geibel Cert. Ex. D at

14

The remaining state law counts in the complaint are likewise
fatally deficient. To begin with, the state-law fraud and
misrepresentation claim (Count III) fails with respect to the
misrepresentations and omissions alleged because, as described above,
the elements of reasonable reliance, scienter, and loss causation are
not remotely established. <u>See, e.g.</u>, <u>May Dep't Stores Co. v. Int'l</u>
<u>Leasing Corp.</u>, 1 F.3d 138, 141 (2d Cir. 1993) ("The elements of a
fraud claim under New York law are 'a material, false representation,
an intent to defraud thereby, and reasonable reliance on the
representation, causing damage to the plaintiff.'"); <u>see also</u> <u>Fezzani</u>
<u>v. Bear, Stearns & Co.</u>, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008)
("Courts in the Second Circuit have found that the 'elements of
common law fraud are essentially the same as those which must be
pleaded to establish a claim under § 10(b) and Rule 10b-5.'").

Further, the breach of contract claim (Count II) is flawed
because of plaintiff's failure to identify with any specificity the
terms of the contract that was allegedly breached. <u>E.g.</u>, <u>Chrysler</u>
<u>Capital Corp. v. Hilltop Egg Farms, Inc.</u>, 514 N.Y.S.2d 1002, 1003
(App. Div. 1987). Nor, in any event, can plaintiffs point to any
such contractual terms in connection with the Harborspire investment,
because the offering documents make clear that the distributions to
holders of Class B interests are contingent on sufficient cash flow
and in the discretion of the general manager. Similarly, plaintiff's

---

11, which established him as a "qualified investor" for purposes
of Regulation D offerings, <u>see</u> 17 C.F.R. § 230.501(a)(5) (2005).

allegations of "monies loaned" (Count IV) must be dismissed because the offering documents make clear that the investment was not a loan.

Finally, the complaint's theories of unjust enrichment and monies had and received (Count V) are quasi-contractual in nature, and therefore cannot proceed in the face of the express contracts governing plaintiff's relationship with the Metro Homes and UBS Defendants. In any event, there was no unjust retention of a benefit here, where plaintiff's loses were consistent with the express terms of his investment.

For the foregoing reasons, plaintiff's complaint must be dismissed in its entirety and with prejudice. See S.S. Silberblatt, Inc. v. E. Harlem Pilot Block Bldg. 1 Housing Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979). The Clerk of the Court is directed to enter final judgment dismissing the complaint with prejudice and to close all open documents on the docket of this case.

SO ORDERED.

Dated: New York, NY
       December 29, 2009                    JED (S) RAKOFF, U.S.D.J.

16